UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| BRENDA SIMMONS, | No. 1:18-cv-00829-GSA |
|---|---|
| Plaintiff, | |
| v. | **ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |
| ANDREW SAUL,[1] Commissioner of Social Security, | |
| Defendant. | |

**I.     Introduction**

Plaintiff Brenda Simmons ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2] *See* Docs. 14, 21 and 22. Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

---

[1] Commissioner of Social Security Andrew Saul is substituted as Defendant pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 USC 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 6 and 8.

1

## II. Procedural Background

On November 30, 2015, Plaintiff filed an application for disability insurance benefits alleging disability beginning March 1, 2015. AR 23. The Commissioner denied the application initially on May 31, 2016, and upon reconsideration on September 12, 2016. AR 23. On November 4, 2016, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 23.

Administrative Law Judge Ruxana Meyer presided over an administrative hearing on July 25, 2017. AR 38-90. Plaintiff appeared and was represented by an attorney. AR 38. Impartial vocational expert Judith Najarian (the "VE") also testified. AR 38.

On December 13, 2017, the ALJ denied Plaintiff's application. AR 23-32. The Appeals Council denied review on April 25, 2018. AR 1-3. On June 15, 2018, Plaintiff filed a complaint in this Court. Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony[3]

Plaintiff (born March 21, 1978) lived with her children, her sister, and her sister's children. AR 45. Plaintiff was able to perform her own personal care. AR 73. She could feed herself, open doors and open jars. AR 76. She could pick things up and put them away. AR 73. She could rarely do dishes or laundry, sweep or vacuum. AR 73. Nonetheless, she did all the laundry for herself and her children. AR 79. Although she could only shop for about twenty minutes, Plaintiff enjoyed grocery shopping because it got her out of the house. AR 73-74.

As a young woman, Plaintiff completed a "full charge bookkeeping" course. AR 49. More recently, she attended online college in accounting but stopped for health reasons. AR 49. She had held a variety of jobs in bookkeeping and other office positions. AR 53-60. Her continual fatigue and pain impaired her work. AR 50. In 2015, her last employer fired her for multiple errors. AR 51-52. She was supporting herself on welfare with her sister's help. AR 60.

---

[3] On or about January 3, 2016, Plaintiff requested an expedited hearing based on her recent cancer diagnosis. AR 160, 304. At the hearing, the ALJ questioned the file designation of terminal illness, and Plaintiff's attorney agreed that in his review of the administrative record he also failed to find any evidence that Plaintiff had been diagnosed with cancer ("a malignancy"). AR 42-43.

2

Plaintiff had a driver's license. AR 48. She drove her children to school and drove herself for shopping. AR 48.

Plaintiff reported repetitive motion injuries to her hands, including tendonitis and carpal tunnel syndrome, which resulted in her taking a year off from work in 2012 and 2013. AR 61-63. She had "whole body pain," particularly in her back, neck, shoulders, and arms. AR 62-63. The back pain extended into her right leg. AR 67. She took six oxycodone daily to relieve her pain, but they had little effect. AR 64, 72. Recent weight loss had not alleviated her pain. AR 64. Plaintiff took other medication for heart palpitations, depression and anxiety. AR 69. Ten times daily, she rested for thirty minutes at a time. AR 71.

Plaintiff could not stand in one place. AR 74. She could stand and walk for fifteen to thirty minutes before she needed to sit down and rest for up to one hour. AR 74-75. She could sit for ten to thirty minutes before needing to change position. AR 75. Because of muscle weakness in her arms, Plaintiff could lift only five to ten pounds. AR 75-76. Her brain was foggy, so thinking was difficult. AR 77. She could not concentrate on television or movies. AR 77-78.

### B. Medical Records

On January 19, 2012, Plaintiff underwent a gastric biopsy which revealed mild chronic superficial gastritis. AR 322. A colonoscopy also performed on January 19, 2012, was normal except for internal hemorrhoids. AR 323.

Cervical spine x-rays dated April 14, 2013, revealed mild degenerative changes, mild encroachment at C4-5 by spurring, and straightening of the spine suggesting spasm. AR 282.

The record includes notes of Plaintiff's treatment by Daniel Watrous, M.D., a specialist in arthritis and osteoporosis, from April 6, 2015, through April 28, 2017. AR 475-91, 549-55, 698-752. Dr. Watrous' early examination notes indicate that Plaintiff's diagnoses included fibromyalgia, unspecified endometriosis, low back pain, sleep disturbance, fatigue and malaise. Plaintiff consistently complained of joint pain. Except for two instances of normal results, Plaintiff's blood pressure was high or very high. AR 476, 480, 484, 487, 490.

On April 6, 2015, Plaintiff complained of pain all over, greater on her right side. AR 489. Stress and depression were exacerbating her pain. AR 489. Plaintiff reported hair loss, fatigue,

cough, weight gain, leg swelling, bruising and muscle weakness. AR 489. Dr. Watrous continued a diagnosis of fibromyalgia. AR 490. Plaintiff's medications included Norco, Gabapentin, Ibuprofen and Soma. AR 490. Beginning in August 2015, Dr. Watrous began administering Toradal injections. AR 484. Dr. Watrous noted that he encouraged Plaintiff to see a psychologist to manage depression and stress, but Plaintiff's insurance limited her access to mental health support. AR 490. In December 2015, Dr. Watrous referred Plaintiff for aquatic therapy and physical therapy, including a home exercise program. AR 477. (The record does not indicate whether Plaintiff participated in the recommended therapy.)

From April 29, 2015, through May 9, 2017, Tulare Community Health Clinic[4] physicians, and physician assistants, saw Plaintiff regularly for hypertension, hyperlipidemia and anxiety as well as acute complaints including thyroid problems, earache, accidental knee injury, chest pain, rash, sore throat and colds. AR 431-65, 560-69, 755-882. The examination notes repeatedly mentioned Plaintiff's heavy smoking.

On October 7, 2015, Plaintiff was treated at the Tulare Regional Medical Center ("TRMC") emergency department for coughing, chest pain and difficulty breathing. AR 407-25. Chest x-rays were generally normal but indicated moderate to moderately severe COPD or asthma and mild thoracic degenerative changes. AR 872.

On October 29, 2015, cardiologist Shaukat Ali, M.D., administered a stress echocardiographic study of Plaintiff, who had experienced chest pain. AR 333-48. Test results reported: (1) no exercise induce[d] ischemia by stress echocardiography; (2) good functional capacity (9 minutes); (3) no angina or arrhythmia; and, (4) a normal resting echocardiogram. AR 333.

On October 31, 2015, Plaintiff went to the TRMC emergency department reporting chest pain and palpitations. AR 358-406. Prudence Smith, M.D., found no evidence of pneumonia, CHF or effusions; normal heart size; and, mild hyperinflation with some peribronchiolar coarsening. AR 381.

---

[4] During the pendency of Plaintiff's application for benefits, Tulare Community Health Clinic changed its name to Altura Centers for Health.

4

On April 14, 2016, cervical spine x-rays indicate mild degenerative changes, straightening of spine suggesting spasm, preservation of disk space and vertebral alignment, mild encroachment upon neural foramina by a bone spur at C4/C5, no acute cervical fracture or prevertebral soft tissue swelling, and no apical pneumothorax. AR 536. A computed axial tomographic imaging (CT) scan of the cervical spine administered on the same day also revealed soft tissue masses most consistent with mildly enlarged lymph nodes and nonspecific thickening of the thyroid isthmus with a 5 mm. low density lesion on the left. AR 283

A May 9, 2016, ultrasound analysis of Plaintiff's thyroid identified: (1) a mildly prominent isthmus measuring 6 mm. thick; (2) a 6 x 13 mm diameter solid hypoechoic nodule in the mid right lobe of the thyroid; (3) a 7 mm. solid hypoechoic nodule in anterior left lobe; and, (4) a 2 mm. cyst in the inferior left lobe. AR 547.

By May 2016, Dr. Watrous had added diagnoses of hand pain, depression, neck pain, enlarged lymph nodes and tachycardia paroxysms. AR 549. Nerve conduction studies administered on May 12, 2016, indicated that median nerve conduction across both the right and left wrists and the left ulnar nerve were within normal limits, but there was nonspecific low right ulnar sensory amplitude. AR 527. Accordingly, Dr. Watrous removed carpal tunnel syndrome from Plaintiff's diagnoses. AR 555.

On July 22, 2016, a CT scan of Plaintiff's neck investigated lymphadenopathy (enlarged lymph nodes). AR 572-73. Frank Macaluso, M.D., analyzed the scan and noted:

> 1. Multiple mildly prominent bilateral cervical and submandibular lymph nodes are seen. The appearance is similar to 04/14/2016 CT scan of the cervical spine. Most of these lymph nodes measure less than 15 mm diameter. Bilateral jugulogastric nodes, each measured about 2 cm in diameter. This is likely mild reactive lymphadenopathy. The possibility of lymphoma is not excluded. Correlate clinically.
>
> 2. Mild soft tissue prominence both tonsiliar pillars suggest mildly hypertrophy [*sic*] versus inflamed adenoidal tissue. No evidence of tonsiliar abscess. No abnormal fluid collections or foci of abnormal contrast enhancement are seen in the neck.
>
> 3. There is no epiglottal enlargement. The true and false vocal cords are normal in size and symmetric. The parotid glands and submandibular glands are normal in size and symmetric. The thyroid isthmus is mildly prominent. Both lobes of the thyroid gland are

5

> normal in size. Please see separate report of 05/05/2016 thyroid ultrasound study.
>
> Degenerative changes facet joints cervical spine on the left noted as described above. Visualized sinuses are clear. Exam is otherwise unremarkable.

AR 572-73.

A second CT scan on December 13, 2016, revealed no significant change from the July scan. AR 616.

On August 16, 2016, Plaintiff saw her gynecologist Parul Gupta, M.D., complaining of lumps in her breasts and abnormal discharges. AR 587-90. A subsequent diagnostic mammogram identified no significant mammographic change with benign-appearing calcifications and masses consistent with lymph nodes. AR 598-99.

On August 22, 2016, Plaintiff was treated for heart palpitations in the TRMC emergency department. AR 623. Treating physician Salah Sherif, M.D., advised Plaintiff to cut back on caffeine and see her family doctor. AR 630.

No phenotypical abnormalities were detected in a peripheral blood and bone marrow test completed September 29, 2016. AR 863, 868. Analysis of a needle biopsy of a cervical lymph node on October 7, 2016, revealed reactive lymphocytes consistent with reactive lymph nodes. AR 862. Lumbar spine x-rays on October 13, 2016, were normal and showed no change since April 1, 2013. AR 618. An October 25, 2016 CT scan of Plaintiff's abdomen and pelvis was unremarkable except for mild heptomegaly, a small right renal cyst and a 15-mm right ovarian cyst. AR 617.

In a report dated December 29, 2016, Francis McCully, Jr., M.D., stated that a PET scan of Plaintiff's body from the skull base to mid-thigh revealed abnormal hypermetabolic activity in Plaintiff's neck and throat but not in her brain. AR 856. The impression was:

> Relatively intense hypermetabolic activity involving the palatine tonsils, floor of the mouth-tongue as well as the vocal cords. Etiology unclear. Infectious-inflammatory as well as physiologic etiologies are entertained as discussed above. Recommend ENT consultation and direct visualization. The palatine tonsils appear hypertrophied for age narrowing the airway.

///

6

> Mild increased metabolic activity low cervical esophagus. Again etiology unclear. Physiologic-infectious-inflammatory as well as neoplastic etiologies are entertained here. Recommend clinical correlation. GI consult herd [*sic*] may be of benefit. Findings are very subtle here.

AR 857.

On January 31, 2017, Dr. McCully added that no abnormal hypermetabolic activity was observed in Plaintiff's abdomen. AR 858.

A sonogram of Plaintiff's thyroid gland in February 2017, indicated a benign thyroid goiter without suspicious thyroid nodule. AR 873.

On March 7, 2017, otolaryngologist Jagdev Singh, M.D., examined Plaintiff following a referral by Dr. Watrous. AR 659-60. The examination was generally normal, although Dr. Singh noted severe gingivitis and carious (decayed) teeth. AR 659. The doctor opined that the hypermetabolic activity in Plaintiff's throat and neck might be attributable to chronic inflammation caused by her severe dental problems. AR 660. Dr. Singh recommended that Plaintiff "cut down on smoking and see a good dentist." AR 660.

In June 2017, Dr. Watrous added a diagnosis of "cancer thyroid unspecified." AR 887. Only the first page of the examination notes is included in the record, and no basis for the diagnosis is articulated.

### C. Medical Opinions: Agency Physicians

Agency reviewers questioned Plaintiff's credibility, noting that her activities of daily living were overly restrictive, and her reports were contradictory. AR 98. On initial review, physician Sadda Reddy, M.D., wrote:

> The claimant is a younger individual with allegations of fibromyalgia, endometriosis and hypertension. Hypertension is well controlled with no evidence of end organ damage. No evidence of current severe symptoms due to endometriosis. Chest pain is non-cardiac. Treadmill stress test showed no ischemia and electrocardiogram was normal. The claimant was able to exercise at 10 METS on the Bruce protocol indicating good functional capacity. [History of] fibromyalgia but no evidence of extensive pain management or pain clinic referrals. ADLs indicate that Plaintiff is able to make meals daily, drive and shop for groceries. In my judgment, taking the impact of chronic pain and fatigue into consideration, a light RFC with postural limitations is appropriate

and consistent with the claimant's performance on the treadmill stress test.

AR 99.

Dr. Reddy opined that Plaintiff was able to lift and carry twenty pounds occasionally and ten pounds frequently, and to sit, stand and walk for six hours in an eight-hour workday. AR 102. Although the doctor stated that Plaintiff had postural limitations, the doctor opined that Plaintiff was able to do all postural activities frequently. AR 102. On reconsideration, F. Greene, M.D., found the same physical residual functional capacity as Dr. Reddy. AR 120-21.

### IV.    **Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

///

## V. **The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI. **Summary of the ALJ's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 1, 2015. AR 25. Her severe impairments included depression, anxiety, hypertension, hypothyroidism and chronic fatigue syndrome. AR 25. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526). AR 26.

The ALJ concluded that Plaintiff had the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently; to sit, stand and walk six to eight hours

9

in an eight-hour workday; and, to frequently stoop, crouch, crawl, kneel and climb stairs, ramps, ropes, ladders and scaffolds. AR 27. Plaintiff could perform simple routine tasks involving frequent contact with the general public. AR 27.

Plaintiff was unable to perform her past relevant work as an accounting clerk and bookkeeper. AR 30-31. Considering Plaintiff's age, education, work experience and residual functional capacity, however, jobs that Plaintiff can perform exist in significant numbers in the national economy. AR 31. Accordingly, the ALJ found that Plaintiff was not disabled from March 1, 2015, through December 13, 2017 (the date of the hearing decision). AR 32.

### VII. Omission of Fibromyalgia as a Severe Impairment at Step Two

Plaintiff contends that the ALJ erred in concluding that Plaintiff's fibromyalgia was not a severe impairment. The Commissioner counters that even if the ALJ erred in failing to include fibromyalgia among Plaintiff's impairments, the error was harmless because the ALJ based her residual functional capacity determination on all limitations of record without regard for the impairment(s) to which those limitations related. The Court agrees that any error here was harmless.

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii). An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments. 20 C.F.R. § 416.902(f). If a claimant does not have an impairment of combination of impairments which significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment. 20 C.F.R. § 416.920(c).

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id.* at 1290; SSR 85-28. "[T]he severity regulation is to do no 'more than allow the Secretary to deny benefits summarily
///

to those applicants with impairments of a minimal nature which could never prevent a person from working.'" SSR 85-28 (quoting *Baeder v. Heckler*, No. 84-5663 (3d Cir. July 24, 1985)).

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his or her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The ruling warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, if the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen suffered from childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291.

Plaintiff's situation is distinguishable. Despite finding at step two that Plaintiff's fibromyalgia was not a severe impairment, the ALJ in this case carefully considered the evidence

///

11

relating to Plaintiff's complaints of pain and stiffness in her determination of Plaintiff's residual functional capacity at steps four and five. *See* AR 28-30.

The ALJ emphasized the inconsistency between Plaintiff's representations of the intensity, persistence and limiting effects of her condition and Plaintiff's normal gait, strength and range of motion. AR 28. The ALJ noted that Plaintiff remained able to perform a wide range of daily activities, including the care of her minor children. AR 28. In assessing Plaintiff's physical limitations, the ALJ gave significant weight to the assessments of the state agency physicians, Drs. Reddy and Greene, who both opined that Plaintiff was able to perform light work with frequent postural activities. AR 30. Plaintiff herself favors the opinions of Drs. Reddy and Greene, stating that "[t]hese physicians found the record establishe[d] fibromyalgia as a severe, medically determinable impairment, which was in fact the impairment responsible for significant functional limitations." Doc. 14 at 14.

"In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (quoting *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p) (internal quotations omitted). As a result, a claimant's residual functional capacity should be the same whether or not certain impairments are considered severe. *Buck*, 869 F.3d at 1049. Because the ALJ fully considered the impact of Plaintiff's fibromyalgia in determining her residual functional capacity, any error attributable to the ALJ's determination that Plaintiff's fibromyalgia was not a severe impairment was harmless.

**VIII. Conflicts Between Residual Functional Capacity and Dr. Izzi's Opinion**

Plaintiff contends that although the ALJ appropriately gave great weight to Dr. Izzi's opinion, she erred in failing to include in Plaintiff's residual functional capacity the doctor's opinion of Plaintiff's limitations in social functioning. The Commissioner responds that the ALJ appropriately interpreted Dr. Izzi's opinion in her determination of Plaintiff's residual functional capacity. For the reasons stated below, the Court agrees with the Commissioner.

///

///

### A. Medical Opinions

#### 1. Consultative Psychological Evaluation

On April 17, 2016, psychologist Roger A. Izzi, Ph.D., conducted a consultative psychological examination. AR 510-14. Plaintiff complained of depression and was dysphoric. AR 511. Dr. Izzi administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV) and determined that Plaintiff was functioning in the borderline to average range of intelligence. AR 512. Variability among the subtest scores suggested problems with attention and concentration. AR 512. The doctor also administered the Wechsler Memory Scale-IV (WMS-IV), which revealed deficits in memory functions. AR 513. The doctor diagnosed unspecified depressive disorder. AR 513. Based on his review of Plaintiff's medical records and his interview of Plaintiff, Dr. Izzi opined that Plaintiff's depression would vary according to Plaintiff's perception of her chronic pain. AR 513.

From a psychological viewpoint, Dr. Izzi thought Plaintiff appeared capable of performing a simple and repetitive task on a consistent basis over an eight-hour workday. AR 513. She had moderate limitation in her ability to get along with her peers or be supervised in a work-like setting. AR 513. Fluctuations in Plaintiff's mood were likely and would affect her ability to perform a complex task over an eight-hour period. AR 513. Plaintiff appeared capable of responding normally to issues of attendance and safety, and of dealing with changes in the routine work setting. AR 513.

#### 2. Agency Medical Opinions

R. Paxton, M.D., performed the psychiatric review technique. AR 100. He opined that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social function and concentration, persistence and pace, and one or two episodes of decompensation for an extended period. AR 100. Dr. Paxton opined that Plaintiff had moderate limitations in her ability to carry out detailed instructions and to interact appropriately with the general public, but otherwise had no significant psychological limitations. AR 104-05. On reconsideration, psychologist Barbara Moura agreed with Dr. Paxton's opinions. AR 118, 121-23.

## B. The ALJ's Analysis

In the hearing decision, the ALJ first considered psychological evidence from the medical records:

> The treatment record indicates the claimant's anxiety and depression were doing well on medication. Her memory was intact. However, she reported that stress increased her pain symptoms. It does not appear that she has sought further mental health treatment beyond medication by her general provider.

AR 29 (citations to administrative record omitted).

The ALJ gave little weight to the third-party function report submitted by Plaintiff's sister, favoring medical documentation over the sister's "anecdotal observations." AR 29-30. Plaintiff's sister reported that Plaintiff's physical symptoms caused stress, anxiety and depression that impaired Plaintiff's ability to concentrate or complete activities. AR 29.

Similarly, the ALJ discounted the opinions of Drs. Paxton and Moura, finding that "these opinions . . . appear over restrictive in precluding any public contact based on minimal mental health treatment, documented mental status and observed demeanor at hearing." AR 30.

The ALJ gave the greatest weight and most careful analysis to Dr. Izzi's consultative opinion:

> Roger Izzi, Ph.D., consultatively examined the claimant in April 2016. The claimant reported "thinking too much," unprovoked crying spells and suicidal ideation. She said she last worked May 1, 2015, and she smoked over a pack of cigarettes a day. The claimant reported feeling depressed. Her intellectual functioning was within the borderline to average range with full IQ score of 81. Testing suggested deficits in memory function. Dr. Izzi diagnosed unspecified depressive disorder. Dr. Izzi opined the claimant appeared capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period. He opined the claimant would be moderately limited in her ability to get along with peers or be supervised in a work-like setting, and any significant fluctuation of mood would limit her ability to perform a complex task on a consistent basis over an eight-hour period. The claimant appeared capable of responding to usual work situations regarding attendance and safety issues and dealing with changes in a routine work setting. The undersigned gives this report and opinion great weight. It appears consistent with the overall record that indicates the claimant's mental symptoms are treated with medication. Although Dr. Izzi was not specific regarding the social functioning limitations, the undersigned finds that the limited treatment and ability to answer questions and interact appropriately as documented in the file and at

[the] hearing, indicate at most, a limitation to frequent contact with the public.

AR 30 (citations to administrative record omitted).

Accordingly, the ALJ determined that Plaintiff had the residual functional capacity mentally to perform simple routine tasks involving frequent contact with the public. AR 27.

### C. **Analysis**

Plaintiff would construe the evidence differently than the ALJ. Plaintiff's analysis and preferred outcome are not binding here. "[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). An ALJ may determine the weight of medical opinions by considering the evidence in the record as the ALJ did here. 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The Court is not required to accept Plaintiff's characterization of her treatment records. An ALJ appropriately disregards a medical opinion if it does "not show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity." *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 601 (9th Cir. 1999). Similarly, the ALJ may properly reject an opinion that is conclusory and unsubstantiated by relevant medical documentation. *Johnson v. Shalala*, 60 F.3d 1428, 1432-33 (9th Cir. 1995.) The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity. *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999). Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina*, 674 F.3d at 1111-1112 (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions); *Tommasetti*, 533 F.3d at 1041 (incongruity between questionnaire responses and the Plaintiff's medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion). In short, the ALJ fully supported her departure from a portion of Dr. Izzi's opinion with other evidence of record.

///

Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

### IX. Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Brenda Simmons.

IT IS SO ORDERED.

Dated: **August 12, 2019**        **/s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE